IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 25-cv-01120-GPG

JORGE BONILLA ESPINOZA,

      Petitioner,

v.

DAWN CEJA, in her official capacity as warden of the Aurora Contract Detention Facility;
ROBERT GUADIAN, in his official capacity as Field Office Director, Denver, U.S. Immigration and Customs Enforcement;
KRISTI NOEM, in her official capacity as Secretary, U.S. Department of Homeland Security;
TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; and
PAMELA BONDI, in her official capacity as Attorney General of the United States;

      Respondents.

---

## ORDER

---

Before the Court are Petitioner Jorge Bonilla Espinoza's (Petitioner) Petition for Writ of Habeas Corpus (the Habeas Petition) (D. 1) and Motion for Temporary Restraining Order (the TRO Motion) (D. 2). Because Petitioner—an applicant for admission into the United States—has not established that Respondents have deprived him of due process of law by not affording him an individualized bond hearing, the Court DENIES the Habeas Petition. Because the Court denies the Habeas Petition, it DENIES the TRO Motion as moot.

### I. FACTUAL BACKROUND

Petitioner is a native and citizen of El Salvador (D. 7-1 at 2). Beginning around 2017, Salvadoran police began harassing and threatening him on the purported basis that he was

1

associated with criminal organizations like MS-13—associations he denied (D. 1 at 5). That year, police arrested Petitioner and charged him with a crime or crimes based on his purported gang affiliations (*id.*). Authorities held Petitioner in custody for over nine months, during which time he was beaten by police officers, handcuffed to another detainee for several weeks, and held only in his underwear for long periods of time (*id.*). Authorities also denied Petitioner food and forced him to sleep on a metal bed with no mattress or sheets (*id.*). Petitioner had neither access to counsel nor any information about the pending charges against him (*id.*). But ultimately, a judge found him innocent and ordered his release (*id.*).

This did not end authorities' harassment of Petitioner, however (*id.*). Between 2018 and 2021, police continued stopping Petitioner on the street, accusing him of working with MS-13, beating him, and threatening to re-arrest him (*id.*). This harassment persisted even after Petitioner moved to a different neighborhood (*id.*). In September 2021, police once again stopped Petitioner and detained him for a further six days after he denied having information about certain criminal organizations (*id.* at 6). Police severely beat Petitioner while he was in custody (*id.*).

In March 2022, El Salvador declared a "State of Exception," suspending various constitutional rights and cracking down on suspected gang members (*id.*). In December 2022, authorities entered and searched Petitioner's home without a warrant and again arrested him (*id.*). And again, they beat Petitioner severely (*id.*). After a further fifteen days of detention, Petitioner was released (*id.* at 6–7). Also in December 2022, authorities detained Petitioner's mother (*id.* at 7). Petitioner believes they did so because of his mother's advocacy work, including on issues of police violence (*id.*). Authorities simultaneously detained Petitioner's sisters (*id.*). Petitioner's mother and sisters have now been held in custody for over two years (*id.*).

Petitioner fled El Salvador in January 2023, shortly after his mother and sisters' arrest (*id.*).[1] On February 7, 2023, U.S. Customs and Border Protection (CBP) contacted Petitioner near El Paso, Texas, shortly after he waded across the Rio Grande and unlawfully entered the United States (D. 7-1 at 2). At that point, Petitioner did not claim he feared persecution if he returned to El Salvador (*id.*). CBP then detained him under 8 U.S.C. § 1225(b) and placed him in expedited removal proceedings (*id.*). Petitioner allegedly escaped CBP custody as CBP attempted to transport him to a detention facility (*id.*). CBP officers located Petitioner after a search and took him into custody once again (*id.*).

Petitioner was charged with illegal entry under 8 U.S.C. § 1325(a)(1) (*id.*). He was convicted of that offense on March 21, 2023, and sentenced to 90 days in prison (*id.*). On May 5, 2023, Petitioner was transferred to Immigration and Customs Enforcement (ICE) custody (*id.*). At that time, he was detained at the El Paso Service Processing Center (*id.*).

Around May 9, 2023, Petitioner claimed that he feared persecution if he returned to El Salvador (*id.* at 3). ICE referred Petitioner to U.S. Citizenship and Immigration Services (USCIS) for an interview under 8 U.S.C. § 1225(b)(1)(A)(ii) (*id.*). On May 15, 2023, USCS conducted this interview and found that Petitioner had established a credible fear that he would be persecuted or tortured if returned to El Salvador (*id.*).

The Department of Homeland Security (DHS) filed a Notice to Appear (NTA), initiating removal proceedings in immigration court pursuant to 8 U.S.C. § 1229a (*id.*). The NTA charged that Petitioner was inadmissible to the United States under 8 U.S.C. § 1182(a)(6)(A)(i) and

---

[1] Petitioner learned in November 2024 that Salvadoran authorities have also arrested his partner (the mother of his youngest daughter) (D. 1 at 7).

(a)(7)(A)(i)(I) (*id.*). The NTA scheduled Petitioner for a hearing before an immigration judge (IJ) on June 8, 2023 (*id.*). This hearing was later rescheduled for June 12, 2023 (*id.*). Petitioner appeared for the June 12, 2023 hearing, and asked the IJ for time to consult with an attorney (*id.*). The IJ granted this request (*id.*).

Petitioner's next hearing occurred on July 5, 2023 (*id.*). Petitioner admitted to the NTA's allegations (*id.*). The IJ sustained the charges of inadmissibility and scheduled another hearing for Petitioner to file an application for relief before the Executive Office for Immigration Review (EOIR) (*id.* at 3–4). Petitioner appeared for a further hearing on September 6, 2023, before the IJ (*id.* at 4). He requested further time to prepare, and the IJ granted this request and scheduled another hearing for October 18, 2023 (*id.*).

At the October 18, 2023 hearing, Petitioner filed an application for asylum, withholding of removal, and Convention Against Torture (CAT) protection (*id.* at 4, 15, 19). The IJ scheduled a merits hearing on Petitioner's application for November 21, 2023 (*id.* at 4). But ICE placed Petitioner in quarantine for health reasons, so Petitioner was unavailable for a hearing on that date (*id.*). EOIR rescheduled Petitioner's merits hearing for January 2, 2024 (*id.*).

In the meantime, ICE transferred Petitioner from the El Paso Service Processing Center to ICE's Aurora, Colorado facility (where Petitioner remains detained) (*id.*). DHS filed a motion for a change of venue from EOIR El Paso to EOIR Aurora on December 8, 2023 (*id.*). The IJ granted this motion on December 11, 2023 (*id.*). EOIR set Petitioner's case for a hearing on January 10, 2024 (*id.*).

At the January 10, 2024 hearing, the IJ rescheduled Petitioner's merits hearing for February 26, 2024 (*id.*). When he appeared for the February 26, 2024 hearing, Petitioner again requested

additional time to prepare, which the IJ granted (*id.*).

Petitioner appeared for what ultimately would be his merits hearing on April 9, 2024 (*id.* at 5). The IJ denied Petitioner's application and ordered him removed to El Salvador (*id.* at 5, 19–31). The IJ expressed "some concerns" about Petitioner's credibility, noting that Petitioner had asserted novel allegations (including allegations relating to police beatings) for the first time at the hearing (when he had not included these allegations in his personal declaration) (*id.* at 21). The IJ did, however, "stop short of finding [Petitioner] not credible" (*id.* at 22). The IJ denied Petitioner's requests for asylum and withholding of removal on the grounds that (1) Petitioner had not established that he had experienced harm "ris[ing] to the level of past persecution" (*id.* at 23), and that, (2) even if he had, Petitioner had not established a nexus between that persecution and a protected ground (*id.* at 24–26). The IJ denied Petitioner's request for CAT relief because (1) while Petitioner alleged mistreatment at the hands of Salvadoran authorities, he did not establish that this mistreatment rose to the level of torture (*id.* at 28); (2) Petitioner did not establish that he would likely be tortured in the future (*id.* at 29); and (3) Petitioner might mitigate the risk of torture by relocating to an area of El Salvador where gang activity is less prevalent (*id.* at 30).

Petitioner appealed the IJ's decision to the Board of Immigration Appeals (BIA) on April 29, 2024 (*id.* at 5). The BIA set a briefing schedule on May 14, 2024 (*id.*). This schedule imposed a filing deadline of June 4, 2024 for both parties (*id.*). Petitioner requested a briefing extension on June 17, 2024, which the BIA denied as untimely (*id.*). Petitioner filed his merits brief on June 24, 2024 (*id.*). The BIA rejected this brief as untimely on June 27, 2024, and dismissed Petitioner's appeal on July 31, 2024 (*id.*). ICE received the BIA's decision and began preparing to remove Petitioner around August 5, 2024 (*id.*).

On August 12, 2024, Petitioner filed a Petition for Review and Motion for Stay of Removal with the United States Court of Appeals for the Ninth Circuit (*id.*). The Ninth Circuit temporarily stayed Petitioner's removal (*id.*). But on October 23, 2024, it determined that it lacked jurisdiction over Petitioner's Petition for Review and lifted the stay (*id.* at 6). The next day, October 24, 2024, the Ninth Circuit transferred Petitioner's case to the United States Court of Appeals for the Tenth Circuit (*id.*).

Petitioner renewed his motion for a stay of removal before the Tenth Circuit on October 24, 2024 (*id.*). The Tenth Circuit issued a temporary stay on November 8, 2024, and, on November 26, 2024, granted Petitioner's stay request on a more permanent basis (*id.*). As of the date of this Order, the Tenth Circuit's stay order remains in effect and Petitioner's Petition for Review remains pending before the Tenth Circuit. Petitioner has also filed a motion to reopen with the BIA (filed in January 2025), which likewise remains pending (D. 1 at 9). Petitioner is currently in custody at ICE's Aurora facility (*id.* at 3–4). ICE has now held Petitioner in custody for over two years, during which time Petitioner has not received a bond or custody redetermination hearing (*id.* at 2).

On April 9, 2025, Petitioner filed the instant Habeas Petition and TRO Motion, challenging his continued confinement (D. 1; D. 2). He claims that due process requires an individualized bond hearing, which he has not received, and seeks either his release or an order compelling an IJ to conduct such an individualized bond hearing. The Court set a briefing schedule on the TRO Motion and Habeas Petition (D. 5). Both the TRO Motion and Habeas Petition are now fully briefed (D. 1; D. 2; D. 7; D. 8). The Court held a hearing on the TRO Motion and Habeas Petition

on May 5, 2025 (D. 9).[2]  Petitioner's TRO Motion and Habeas Petition are both ripe for resolution.

## II.  LEGAL STANDARDS

### A.  Habeas

Under 28 U.S.C. § 2241, a district court may issue a writ of habeas corpus if the petitioner is held "in custody in violation of the Constitution or laws or treaties of the United States."  Habeas is an appropriate vehicle for challenging the constitutionality of immigration detention.  *See Soberanes v. Comfort*, 388 F.3d 1305, 1310 (10th Cir. 2004) ("Challenges to immigration detention are properly brought directly through habeas." (citing *Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001))); *Diaz-Ceja v. McAleenan*, No. 19-CV-00824-NYW, 2019 WL 2774211, at *3 (D. Colo. July 2, 2019) ("Federal courts have habeas jurisdiction to examine the statutory and constitutional bases for immigration detention unrelated to a final order of removal.").

### B.  Legal Framework for Immigration Detentions

"The Immigration and Nationality Act (INA), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), provides the framework for the detention of aliens in or attempting to enter the United States."  *Gonzalez Aguilar v. McAleenan*, No. 19-CV-0412 WJ/SMV, 2019 WL 5864821, at *2 (D.N.M. Nov. 8, 2019), *report and recommendation adopted sub nom. Gonzalez Aguilar v. Wolf*, 448 F. Supp. 3d 1202 (D.N.M. 2020).  It authorizes immigration officials to detain certain categories of noncitizens.[3]

---

[2] During the hearing, Petitioner indicated that he has asserted—and that the United States Attorney General has denied—multiple parole requests under 8 U.S.C. § 1182(d)(5)(A).

[3] Though the Court recognizes that the INA and many cases use the term "alien" to refer to noncitizens, the Court prefers and will use the term "noncitizen," except where quoting the parties' briefing, a statute, or a case.  *See Williams v. Garland*, 59 F.4th 620, 624 n.1 (4th Cir. 2023) ("We use 'noncitizen' in place of the statutory 'alien,' which has been recognized as an 'archaic and dehumanizing' term. (quoting Maria Sacchetti, *ICE, CBP to Stop Using 'Illegal Alien' and 'Assimilation' Under New Biden Administration Order*, Wash. Post (Apr. 19, 2021),

### 1. Applicants for Admission

One such category is applicants for admission into the United States—that is, noncitizens who "arrive[] in the United States" or are "present" in the United States but who "ha[ve] not been admitted." 8 U.S.C. § 1225(a)(1).  Generally speaking, applicants for admission may be detained under one of two subsections of 8 U.S.C. § 1225(b).  Section 1225(b)(1) "applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation" along with "certain other aliens designated by the Attorney General in his discretion." *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018).  Section 1225(b)(2) "is broader" and generally "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)." *Id.*

Noncitizens falling under § 1225(b)(1) are typically removed on an expedited basis.  *Id.* (citing 8 U.S.C. § 1225(b)(1)(A)(i)).  But this is not always the case:

> [I]f a § 1225(b)(1) alien "indicates either an intention to apply for asylum . . . or a fear of persecution," then that alien is referred for an asylum interview. § 1225(b)(1)(A)(ii). If an immigration officer determines after that interview that the alien has a credible fear of persecution, "the alien shall be detained for further consideration of the application for asylum." § 1225(b)(1)(B)(ii).

*Id.*

Noncitizens falling under § 1225(b)(2) "are detained pursuant to a different process." *Id.* at 288.  Specifically, § 1225(b)(2)(A) provides that those noncitizens "shall be detained for a [removal] proceeding" if "the examining immigration officer determines that [they are] not clearly and beyond a doubt entitled to be admitted" into the United States.

---

https://www.washingtonpost.com/immigration/illegal-alien-assimilation/2021/04/19/9a2f878e9ebc-11eb-b7a8-014b14aeb9e4_story.html)).

While the detention provisions applying to applicants for admission are facially mandatory, an applicant for admission may seek temporary release on parole: under 8 U.S.C. § 1182(d)(5)(A), "[t]he Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." Parole does not equate to admission. *Id.* And when "the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.*

### 2. Deportable Noncitizens

The INA permits immigration authorities to detain not only noncitizen applicants for admission, but also certain classes of "deportable aliens" already "in and admitted to the United States." 8 U.S.C. §§ 1226, 1227. "Section 1226 generally governs the process of arresting and detaining that group of aliens pending their removal." *Jennings*, 583 U.S. at 288. For the most part, arrests and detentions carried out under this statute are discretionary. Indeed, the "default rule," laid out in § 1226(a), is that "[t]he Attorney General may issue a warrant for the arrest and detention of an alien 'pending a decision on whether the alien is to be removed from the United States.'" *Id.* (quoting 8 U.S.C. § 1226(a)). And once a noncitizen is detained, the Attorney General, "[e]xcept as provided in subsection (c)" of § 1226, "may release" a noncitizen detained under Section 1226(a) "on bond . . . or conditional parole." 8 U.S.C. § 1226(a). Section 1226(c), however, creates a carveout from this general discretionary rule: it mandates that the Attorney

General take into custody and detain noncitizens who have committed certain criminal offenses or engaged in certain terrorist activities. *See* 8 U.S.C. § 1226(c); *see also Jennings*, 583 U.S. at 289 (describing § 1226's structure).

### 3. *Noncitizens Ordered Removed*

Finally, the INA authorizes immigration officials to detain noncitizens ordered removed from the United States. Under 8 U.S.C. § 1231(a), the Attorney General is ordinarily required to remove a noncitizen who has been ordered removed within a period of 90 days—what the statute deems the "removal period":

> Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").

The removal period begins on the latest of: (i) the date the removal order "becomes administratively final"; (ii) if the removal order is judicially reviewed and a court stays the removal of the noncitizen, "the date of the court's final order"; or (iii) the date the noncitizen is released from detention or confinement (if the noncitizen is detained or confined outside of immigration processes). 8 U.S.C. § 1231(a)(1)(B).

Pursuant to § 1231(a)(2)(A), the "Attorney General shall detain the" noncitizen "[d]uring the removal period." But under some circumstances, the government might not be able to effect a noncitizen's removal during the 90-day statutory removal period. When this occurs, "[a] special statute authorizes further detention." *Zadvydas*, 533 U.S. at 682. Specifically, under § 1231(a)(6):

> An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be

detained beyond the removal period and, if released, shall be subject to [] terms of supervision . . . .

**C. Due Process**

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." But due process is situational: the process due in one context is not necessarily due in another. This distinction manifests itself particularly in immigration detention cases "where the nature of [the Fifth Amendment due process] protection may vary depending upon [immigration] status and circumstance." *Zadvydas*, 533 U.S. at 694.

It is a "fundamental premise of immigration law" that the federal government need not afford noncitizens the same procedural protections as citizens. *Demore v. Kim*, 538 U.S. 510, 521 (2003). Indeed, the United States Supreme Court has "firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Id.* at 522. The government need not treat different categories of noncitizens the same, either: "[t]he fact that aliens within the territorial jurisdiction of the United States are protected by the Due Process Clause . . . does not lead to the conclusion . . . that all aliens must be treated alike." *M.S.P.C. v. U.S. Customs & Border Prot.*, 60 F. Supp. 3d 1156, 1167 (D.N.M. 2014), *vacated as moot*, No. 14-cv-0769 JCH/CG, 2015 WL 7454248 (D.N.M. Sept. 23, 2015). Ultimately, citizens and distinct categories of noncitizens sit on a due-process-entitlement continuum. Noncitizens seeking admission to the United States sit on the low end of this continuum, and lawful permanent residents and United States citizens sit on the high end. *Gonzalez Aguilar,* 2019 WL 5864821, at *4 (explaining that constitutional rights—including due process—exist on a "sliding scale"). The government possesses particular latitude to draw such distinctions in the immigration context

because "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Demore*, 538 U.S. at 522 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 n.17 (1976)).

### III.  ANALYSIS

Petitioner and Respondents agree that Petitioner is an applicant for admission, and that 8 U.S.C. § 1225(b) mandates his detention during the pendency of his asylum proceedings.  But they dispute the significance of Petitioner's non-admitted status.  From Petitioner's perspective, detention is detention is detention, and an immigration detainee's statutory status does not bear on that detainee's procedural due process entitlements.  Thus, an applicant for admission detained under § 1225(b) is identically situated for due process purposes to, say, an admitted noncitizen who is mandatorily detained under § 1226(c) after committing a qualifying crime and being placed in removal proceedings.  Respondents—various government officials Petitioner is suing in their official capacities—counter that, because Petitioner has not been admitted into the United States, his procedural due process rights are limited to the process the federal government has established through statute under a legal doctrine known as the entry fiction.

Ultimately, the Court concludes that Respondents' position is more consistent with Supreme Court authority, Tenth Circuit authority, and the weight of authority within the Tenth Circuit addressing §1225(b) detentions.  For this reason, the Court finds that Petitioner has not established that his detention under §1225(b) without an individualized bond hearing violates the Fifth Amendment.

But even if the Court accepted Petitioner's position that his non-admitted status has no implications for due process, the Court would still find that Petitioner's detention comports with the Fifth Amendment.  It's not the case that Petitioner hasn't had the ability to challenge his detention: he has received significant process to date relevant to that detention, including a merits hearing, an appeal to the BIA, and the opportunity to assert multiple parole requests.  Success in any of these proceedings would have resulted in Petitioner's release.  The Court views Petitioner's case, where he has had these multiple opportunities over the course of his detention, as significantly different from those cases in which government misconduct or inaction causes a detainee to wait significant time before receiving any administrative process, or significant delays within the administrative process.  Petitioner has not established, nor is the Court convinced, that any delta exists between the process Petitioner has received and the process he may be due. Petitioner's immigration case has proceeded apace.  So long as that continues to be true, Petitioner's continued detention comports with due process, entry fiction aside.

### A.  Under the entry fiction, Petitioner is entitled only to such process as Congress confers through statute

In *Shaughnessy v. United States ex rel. Mezei*, the United States Supreme Court held that, when it comes to due process, "an alien on the threshold of initial entry" stands on a "different footing" when compared to noncitizens "who have once passed through our gates."  345 U.S. 206, 212 (1953).  Specifically, under *Mezei*, an arriving noncitizen is entitled only to the process conferred by statute: "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."  *Id.* (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)).  Applying this rule, the *Mezei* Court held that the petitioner, who was held in immigration detention on Ellis Island, was not entitled to habeas relief on a due process

theory—the government had followed the procedures established by the applicable immigration statutes, and that was the extent of the process the petitioner was due. *Id.* at 207–16.

*Mezei* applies to limit the due process entitlements of noncitizen applicants for admission, even when those noncitizens are detained within the United States. Under what courts refer to as the "entry fiction" doctrine, "[a]lthough aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Gisbert v. U.S. Att'y Gen.*, 988 F.2d 1437, 1440 (5th Cir. 1993).

Supreme Court decisions post-dating *Mezei* suggest that *Mezei* and the entry fiction it relies upon remain good law. In *Zadvydas*, for instance, the Supreme Court distinguished the petitioners' due process challenge from the due process challenge in *Mezei* on the ground that the petitioners had been admitted to the United States. In so doing, the Supreme Court did not question *Mezei* or its logic, instead characterizing *Mezei*'s principles as well established:

> Although *Mezei*, like the present cases, involves indefinite detention, it differs from the present cases in a critical respect. As the Court emphasized, the alien's extended departure from the United States required him to seek entry into this country once again. His presence on Ellis Island did not count as entry into the United States. Hence, he was "treated," for constitutional purposes, "as if stopped at the border." And that made all the difference.
>
> The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent. Indeed, this Court has held that the Due Process Clause protects an alien subject to a final order of deportation, though the nature of that protection may vary depending upon status and circumstance.

*Zadvydas*, 533 U.S. at 693 (citations omitted).

Further, in *Department of Homeland Security v. Thuraissigiam*, the Supreme Court—citing *Mezei* and other cases—noted that the Supreme Court has "often reiterated th[e] important rule" that, as to foreigners who have not been admitted into the United States, the decisions of administrative officers, acting within powers conferred by Congress, are due process of law. 591 U.S. 103, 138 (2020). And in *Jennings*, the Supreme Court instructed the Ninth Circuit to consider whether "a Rule 23(b)(2) class action [was] the appropriate vehicle for [the] respondents' claims," noting the Ninth Circuit's acknowledgement that "some members of the certified class may not be entitled to bond hearings as a constitutional matter"—an acknowledgement evidently grounded in *Mezei*. 583 U.S. at 313.

In short, the Supreme Court does not appear to have abandoned *Mezei*. *See Gonzalez Aguilar*, 2019 WL 5864821, at *8 (rejecting the petitioner's argument that the Supreme Court's decisions in *Zadvydas*, *Demore*, and *Jennings* had implicitly walked back *Mezei* and concluding that "*Mezei* and *Zadvydas* remain the most direct Supreme Court precedent applicable").

Moreover, the Tenth Circuit has issued rulings addressing the *Mezei* principle, the most recent of which suggests *Mezei* still applies to procedural due process challenges within the Tenth Circuit. In that case, *Sierra v. INS*, the Tenth Circuit held that the petitioner, a Cuban immigrant denied entry into the United States, was entitled to only the procedures contemplated by statute:[4]

---

[4] In at least one case, *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382 (10th Cir. 1981), the Tenth Circuit has expressly declined to apply *Mezei* when asked to do so. But that case is not like the case before this Court, and the Tenth Circuit's subsequent decision in *Sierra* confirms that *Mezei* still applies to procedural due process challenges like Petitioner's that are brought in the Tenth Circuit.

*Rodriguez-Fernandez* involved a habeas petitioner who fled to the United States from Cuba and was ordered removed. 654 F.2d at 1384. But when Cuba refused to take the petitioner back, "the Attorney General ordered his continued detention in the federal penitentiary at Leavenworth." *Id.* at 1384. The Tenth Circuit held that "an excluded alien in

> Although he has been physically present in the United States for more than twenty years, Sierra is "legally considered to be detained at the border and hence as never having effected entry into this country." *Gisbert v. U.S. Attorney Gen.*, 988 F.2d 1437, 1440 (5th Cir.), *amended by* 997 F.2d 1122 (5th Cir. 1993). The Due Process Clause does not provide him a liberty interest in being released on parole. *See Ho* [*v. Greene*, 204 F.3d 1045, 1060 (10th Cir. 2000)]. Ordinarily, then, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544, 70 S.Ct. 309, 94 L.Ed. 317 (1950).

258 F.3d 1213, 1218 (10th Cir. 2001). There is no indication that the Tenth Circuit has overruled this precedent or limited it in a material way. *See Gonzalez Aguilar*, 2019 WL 5864821, at *6 ("*Sierra* remains the Tenth Circuit's most recent opinion deciding the rights of an arriving alien under *Mezei*'s framework, suggesting that the Tenth Circuit will continue to follow *Mezei*'s

---

physical custody within the United States may not be 'punished' without being accorded the substantive and procedural due process guarantees of the Fifth Amendment." *Id.* at 1387. It reasoned that the Fifth Amendment took certain actions constituting punishment off the table—for instance, "killing [] Rodriguez-Fernandez and others in his status on the ground that Cuba would not take them back and this country does not want them," "order[ing] penitentiary confinement for life or a definite term because Cuba would not accept petitioner," or, as relevant to that case, imprisoning the petitioner "for an indefinite period, *continued beyond reasonable efforts to expel the alien*." *Id.* (emphasis added).

The fact pattern in *Rodriguez-Fernandez* is dissimilar to the one before this Court. Here, Petitioner is being detained during the pendency of his asylum proceeding—he is not being detained indefinitely. His detention "will end either when the government grants h[im] asylum or when it removes h[im]." *Gonzalez Aguilar*, 448 F. Supp. 3d at 1211; *see also de la Rosa Espinoza v. Guadian*, No. 20-3126-JWL, 2020 WL 3452967, at *8 (D. Kan. June 24, 2020) (concluding that the petitioner's detention under § 1225(b) had a definite endpoint). Moreover, Petitioner isn't claiming that he is being punished in a way that compromises a substantive due process interest: he is asserting a procedural due process challenge, arguing that his detention requires more robust process. In *Sierra*, the Tenth Circuit indicated that *Rodriguez-Fernandez*'s holding was limited to the substantive due process context, and that, for procedural due process challenges like Petitioner's, the *Mezei* rule applies:

> The above rule [that a noncitizen who has not been admitted to the United States is entitled only to the process conferred by statute] applies to procedural due process challenges such as Sierra's. This case does not involve, and we do not address, a substantive due process challenge to congressional legislation. *Cf., e.g., Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382, 1387 (10th Cir.1981) ("Surely Congress could not order the killing of Rodriguez–Fernandez and others in his status on the ground that Cuba would not take them back and this country does not want them.").

258 F.3d at 1218 n.3.

holding.").  And this Court is bound to follow it.  *See Bath v. Bushkin, Gaims, Gaines and Jonas*, 913 F.2d 817, 819 (10th Cir. 1990) ("The district court is bound to follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits."), *abrogated on other grounds by Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991).

Finally, though district-court-level authority within the Tenth Circuit addressing as-applied due process challenges to detentions under §1225(b) is concededly limited, the judicial officers that have addressed this issue have concluded that *Mezei* applies and that, so long as a detainee is afforded the statutory processes provided in immigration law, he is not denied due process.  *See de la Rosa Espinoza v. Guadian*, No. 20-3126-JWL, 2020 WL 3452967, at *8 (D. Kan. June 24, 2020) ("This Court must follow the guidance from the Tenth Circuit and is persuaded by the analysis in *Gonzalez Aguilar*.  Thus, the applicable statutory process shapes Petitioner's procedural due-process rights and Petitioner has no statutory right to release or a bond hearing."); *Gonzalez Aguilar*, 448 F. Supp. 3d at 1212 ("*Mezei* and its progeny do not hold that Petitioner has no due-process rights; rather, the applicable statutory process shapes her procedural due-process rights. Because Petitioner has no statutory right to release or a bond hearing, she has no due-process right to the relief requested."  (citation omitted)).

In sum, caselaw from the Supreme Court, Tenth Circuit, and other district courts within the Tenth Circuit compels the Court to conclude that Petitioner, as an applicant for admission, is entitled to only the process Congress has conferred on him by statute.  Petitioner does not and cannot argue that he is not receiving the process Congress has established for detainees in his circumstances.  As the Supreme Court has held, § 1225(b), the statute under which Petitioner is

17

detained, does not create a statutory right to a bond hearing. *Jennings*, 583 U.S. at 297. Thus, in detaining Petitioner without a bond hearing, Respondents are not violating Petitioner's procedural due process rights. *See Gonzalez Aguilar*, 448 F. Supp. 3d at 1212 (concluding that the petitioner had "no due-process right to the relief requested" in the absence of a statutory right to release or a bond hearing).

Petitioner's arguments and authorities do not change this result. Petitioner asks that the Court decline to apply *Mezei* and reject the entry fiction doctrine, noting that several courts in other circuits have done so (*see* D. 8 at 2–3 (citing *Kydryali v. Wolf*, 499 F. Supp. 3d 768, 772 (S.D. Cal. 2020); then citing *Mbalivoto v. Holt*, 527 F. Supp. 3d 838, 846 n.7 (E.D. Va. 2020); then citing *Leke v. Hott*, 521 F. Supp. 3d 597, 604 (E.D. Va. 2021); and then citing *Arechiga v. Archambeault*, No. 2:23-cv-00600-CDS-VCF, 2023 WL 5207589, at *3 (D. Nev. Aug. 11, 2023)). But the Court is bound to follow law of this circuit—not that of any other. Petitioner has not established that the law of the Tenth Circuit somehow now differs from what the Tenth Circuit held in *Sierra*, or that the *de la Rosa Espinoza* or *Gonzalez Aguilar* courts misapplied Tenth Circuit law.[5] And Petitioner's in-circuit authorities are inapposite. They exclusively deal with different detention contexts: none address the constitutionality of detaining an applicant for admission under § 1225(b).

---

[5] Petitioner's efforts to factually distinguish *Mezei* from this case also miss the mark, particularly in light of the state of Tenth Circuit law. First, some of Petitioner's cases suggest that *Mezei* was cabined to the national security context, and Petitioner argues that he is not a threat to national security. But the Tenth Circuit's application of *Mezei*'s rule in *Sierra* did not apparently depend on threats the petitioner posed to national security. *See Gonzalez Aguilar*, 448 F. Supp. 3d at 1209 n. 7("[N]o indication exists that the aliens in *Sierra* or other cases threatened national security, and courts still applied *Mezei*'s rule to them." (citing *Sierra*, 258 F.3d at 1216)). Second, some of Petitioner's cases suggest that *Mezei* is distinguishable because its holding depends on the fact that the petitioner's application for admission had been conclusively rejected. But again, there is no indication that the Tenth Circuit's application of the *Mezei* rule in *Sierra* depended on such a conclusive determination. The Court is not persuaded that the Tenth Circuit would decline to apply *Mezei* simply because only two courts—and not more—have rejected Petitioner's claim for asylum and other forms of protection.

The Court does not dispute that there may be valid reasons for the Supreme Court to revisit *Mezei*, or for the Tenth Circuit to revisit the way it applies *Mezei* to procedural due process challenges brought by arriving noncitizens.[6] But "[w]hile *Mezei* may be under siege, it is still good law." *Aracely v. Nielsen,* 319 F. Supp. 3d 110, 145 (D.D.C. 2018); *see also Chi Thon Ngo v. INS*, 192 F.3d 390, 396 (3d Cir. 1999) ("*Mezei* has been much criticized, but has remained a governing precedent and has been applied, with some modifications, in most of the leading cases." (footnote omitted)). Applying *Mezei* as the Tenth Circuit has directed leads to the conclusion that Petitioner's Habeas Petition must be denied.

### B. Even if the entry fiction does not apply, Petitioner's continued detention without a bond hearing comports with due process

Even if *Mezei* and *Sierra* did not govern Petitioner's due process claim, Petitioner's detention would still comply with the Fifth Amendment. The guidance the Supreme Court has issued in its *Zadvydas*, *Demore*, and *Jennings* decisions makes this clear.

Of this trio of cases, only *Zadvydas* concluded that a noncitizen's detention did not comport with due process. But *Zadvydas* addressed an extraordinary situation. The noncitizen petitioners in that case had been ordered removed, but the government was unable to deport them within the statutory removal period. *Zadvydas*, 533 U.S. at 684–686. The government kept them detained under § 1231(a)(6), but had no realistic prospect of deporting them—one petitioner was effectively stateless, and the other petitioner's native country had no repatriation treaty with the United States. *Id.* They thus faced the prospect of indefinite detention. It was continued detention under this

---

[6] On the other hand, there are legitimate arguments that an arriving noncitizen who has never been at liberty within the United States has the same interest in being at liberty within the United States as a noncitizen who has been at liberty within the United States. Moreover, an order directing the government to release a detainee who has been ordered removed and whose claims for asylum and other forms of protection have been found by at least two courts not to be meritorious would seem to seriously compromise the government's interest in determining who may enter.

unique set of circumstances that the Supreme Court held posed a due process problem. *Id.* at 690–91 ("A statute permitting indefinite detention of an alien would raise a serious constitutional problem. . . . The civil confinement here at issue is not limited, but potentially permanent.").

Petitioner's case is not like *Zadvydas*. He doesn't face the prospect of indefinite detention, like the *Zadvydas* petitioners did. He is being detained during the pendency of his asylum proceedings, which necessarily will have an endpoint. *See Gonzalez Aguilar*, 448 F. Supp. 3d at 1211 (noting that the petitioner's detention would end when her asylum proceedings concluded in her favor or she was removed); *de la Rosa Espinoza*, 2020 WL 3452967, at *8 (same). *Zadvydas* thus has no bearing here. *Cf. Bokole v. McAleenan*, 2019 WL 2024922, at *5 (D.N.M. May 8, 2019) (observing that "the Supreme Court to date has found a constitutional problem only with potentially *indefinite* detention" and declining to apply the *Zadvydas* rule to a § 1231 detainee who had been held in custody under various detention statutes for approximately 23 months); *Basri v. Barr*, 469 F. Supp. 3d 1063, 1073–74 (D. Colo. 2020) (noting that *Zadvydas* addressed the "extreme situation" of an alien facing possibly unlimited post-removal detention and stressing that *Zadvydas* "has largely been limited to its facts").

In *Demore*, the Supreme Court validated the practice of detaining noncitizens without a bond opportunity under § 1226(c), holding that "detention during removal proceedings is a constitutionally permissible part of that process"—even when a noncitizen is detained for longer-than-average periods. 538 U.S. at 530–31. In reaching this holding, the Supreme Court distinguished *Zadvydas* on the ground that detention under § 1226(c) serves valid immigration purposes and "ha[s] a definite termination point," where the detention the *Zadvydas* petitioners faced "did not serve its purported immigration purpose" and was potentially indefinite because the

petitioners' 'removal was 'no longer practically attainable.'"  *Id.* at 527–29 (quoting *Zadvydas*, 533 U.S. at 690).

And in *Jennings*, the Supreme Court reversed the Ninth Circuit after the Ninth Circuit had relied on *Zadvydas* to "graft" a six-month detention limit "onto the text of § 1225(b)."  583 U.S. at 298.  The Court critiqued the Ninth Circuit's "fail[ure] to address whether *Zadvydas*'s reasoning may fairly be applied in this case despite the many ways in which the provision in question in *Zadvydas*, § 1231(a)(6), differs materially from . . . §§ 1225(b)(1) and (b)(2)."  *Id.* at 299.  And it distinguished § 1225(b) detentions on the ground that such detentions are limited to a specified period of time—"further consideration of the application for asylum" under § 1225(b)(1) and "for a removal proceeding" under § 1225(b)(2).  *Id.*

The common thread that the Court draws from *Zadvydas*, *Demore*, and *Jennings* is that it is the prospect of indefinite detention that presents a due process issue and that, at least as a general matter, the government may detain a noncitizen during ongoing removal or asylum proceedings. *See Aguayo v. Martinez*, No. 1:20-cv-00825-DDD-KMT, 2020 WL 2395638, at *4 (D. Colo. May 12, 2020) (relying on *Demore* for the principle that "detention of [a] criminal alien is permissible as long as the government is pursuing removal."); *Bokole*, 2019 WL 2024922, at *5 (observing that "the Supreme Court to date has found a constitutional problem only with potentially *indefinite* detention").

The Court doesn't rule out that these cases leave open the possibility of an as-applied challenge to mandatory detention under §§ 1225 or 1226.  Indeed, in his *Demore* concurrence,[7]

---

[7] While Justice Kennedy's *Demore* concurrence is not binding, this Court, like many others, views it as persuasive. *See, e.g.*, *Ramirez v. Watkins*, No. CIV.A. B:10-126, 2010 WL 6269226, at *8 (S.D. Tex. Nov. 3, 2010) (noting "prior Supreme Court decisions" rejecting the proposition "that an opinion written by the majority that does not directly challenge legal interpretations found in a concurrence can be read to acquiesce to the interpretations found in a

Justice Kennedy wrote that "the ultimate purpose behind [] detention [under § 1226(c)] is premised upon the alien's deportability," and so "due process requires individualized procedures to ensure there is at least some merit" to the charge that a noncitizen is deportable. 538 U.S. at 531 (Kennedy, J., concurring). According to Justice Kennedy, if the government "cannot satisfy this minimal, threshold burden," a noncitizen may have at that point a valid claim for additional process. *Id.* at 532. Justice Kennedy further posited that "[w]ere there to be an unreasonable delay by [immigration officials] in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Id.* at 532–33.

This Court's takeaway from Justice Kennedy's *Demore* concurrence is that, so long as the government reasonably affords noncitizen detainees in ongoing immigration proceedings administrative process to challenge the *merits* determinations that are keeping them in custody, continued custody is permissible. In other words, "[p]erhaps it's possible that detention[s]" under §§ 1225(b) and 1226(c) "might become unreasonable if the government . . . arbitrarily extends or suspends" detention, removal, or asylum proceedings. *Aguayo*, 2020 WL 2395638, at *4.

Here, there is no dispute that the government has timely afforded Petitioner multiple opportunities to challenge the reason for his continued custody—his purported removability and ineligibility for asylum or other forms of protection (*see* D. 2 at 15 n.6 (stating that Petitioner's "counsel is not aware of any unreasonable delays caused by the Government in this case")).

---

concurrence" but "[n]everthless" finding Justice Kennedy's concurrence persuasive); *Mehmood v. Sessions*, No. 18-CV-21095, 2018 WL 10760347, at *20 (S.D. Fla. Nov. 28, 2018) ("Although Justice Kennedy's concurrence in *Demore* has no precedential value, it harmonizes with the majority's reasoning. So much so, that post-*Demore* precedent often relied upon Justice Kennedy's concurrence."), *report and recommendation adopted as modified sub nom. Mehmood v. United States Att'y Gen.*, No. 18-21095-CIV, 2019 WL 8892625 (S.D. Fla. Jan. 29, 2019).

Petitioner appeared for a merits hearing on April 9, 2024—roughly 11 months after entering ICE custody. But the government provided Petitioner with earlier opportunities to argue the merits of his claims: the delays in holding this initial hearing were largely attributable to continuances Petitioner requested and a health quarantine—not arbitrary government conduct. Since the IJ rejected Petitioner's asylum claim, Petitioner has remained in ICE custody while he has elected to pursue additional process, including appeals to the BIA and Tenth Circuit. The Court does not find that the Government has arbitrarily or unreasonably dragged these proceedings out.[8]

Petitioner's due process arguments do not engage with the process he has actually received and when he received it. They do not address why the hearings and appeals he pursued, as well as the parole requests he submitted, were collectively inadequate to constitute due process. Instead, Petitioner concludes that he is entitled to the additional procedure of an individualized bond hearing. *Cf. Bokole*, 2019 WL 2024922, at *5–6 ("Mr. Bokole has raised a procedural due process challenge, but he has not addressed in any way the administrative process he received when he twice was considered and rejected for release . . . . Thus, although Mr. Bokole may be able to establish a liberty interest in being free from continued detention, it's not obvious that the only acceptable procedure to protect that interest is a custody hearing before either an immigration judge or this Court."). The Court does not agree that this relief is appropriate—because the government has not arbitrarily or unreasonably delayed the underlying proceedings that are keeping Petitioner detained, there is no delta between the process Petitioner has received and the process he is due.

---

[8] The Court interprets Justice Kennedy's *Demore* concurrence as drawing a distinction between a situation where the government refuses to hold an asylum merits hearing for two years while the noncitizen remains in custody, and the situation here, where Petitioner has been detained for two years, but has received an asylum hearing and multiple appellate opportunities.

Petitioner cites to several cases from this district in which judicial officers ordered the government to provide individualized bond hearings after immigration detainees endured detention for similar amounts of time to what Petitioner has experienced here.[9]  These cases generally applied a six-factor test laid out in *Singh v. Choate*, No. 19-CV-00909-KLM, 2019 WL 3943960, at *5 (D. Colo. Aug. 21, 2019) to assess whether a noncitizen's continued detention without an individualized bond hearing violated due process:

> These factors include (1) the total length of detention to date; (2) the likely duration of future detention; (3) the conditions of detention; (4) delays in the removal proceedings caused by the detainee; (5) delays in the removal proceedings caused by the government; and (6) the likelihood that the removal proceedings will result in a final order of removal.

But in the Court's view, this test cannot be squared with either the majority opinion in *Demore* or Justice Kennedy's *Demore* concurrence.[10]  *Demore* generally validated detentions during the pendency of ongoing immigration proceedings, and Justice Kennedy's concurrence was clear that it is arbitrary government delay in moving proceedings along that potentially triggers a due process problem.[11]  Unless that prerequisite were satisfied, the Court would decline to engage in a due

---

[9] While the Court would not apply the test that these cases relied upon (at least not under all circumstances), the Court is not commenting on how these cases ought to have resolved on their merits.  *See infra* note 12.

[10] Tracing back the chain of authorities the *Singh* test comes from undercuts the *Singh* test's vitality.  *Singh* cites *Jamal A. v. Whitaker*, 358 F. Supp. 3d 853, 858-59 (D. Minn. 2019) for its six-factor test.  *Jamal A.* in turn cites *Muse v. Sessions*, No. 18-CV-0054 (PJS/LIB), 2018 WL 4466052 (D. Minn. Sept. 18, 2018).  But the United States Court of Appeals for the Eighth Circuit abrogated *Muse* and cases applying the *Muse* factors in *Banyee v. Garland*, 115 F.4th 928, 933 (8th Cir. 2024): it concluded that Supreme Court authorities—including *Zadvydas* and *Demore*—"leave no room for a multi-factor 'reasonableness' test" and instead opted for the "bright-line rule" that "the government can detain an alien for as long as deportation proceedings are still '*pending*.'"  *Banyee* aligns with the Court's view that—so long as there is no dilatory conduct on the government's part in immigration proceedings—detention comports with the Constitution while those proceedings are ongoing, and there is no room to apply any sort of due-process balancing test.

[11] The reason Petitioner has been detained for as long as he has is that he has pursued the processes the government has established for him to challenge the government's decision to remove him.  That is not the fault of the government.  And that Petitioner has elected to pursue this process does not mean that the government has deprived him of due process.

process analysis along the lines of that described in *Singh*. To the extent that Petitioner's authorities suggest that courts ought to apply this six-factor test whenever a noncitizen's detention hits a certain length, irrespective of what process they have received and when they have received it, the Court respectfully disagrees.[12]

## IV. CONCLUSION

Based on the foregoing, it is ORDERED that Petitioner's Habeas Petition (D. 1) is DENIED. Because the Court denies the Habeas Petition, it is FURTHER ORDERED that Petitioner's TRO Motion is DENIED AS MOOT (D. 2). *See Aguayo*, 2020 WL 2395638, at *7 (denying TRO request as moot in light of the court's denial of the underlying habeas petition).

The Clerk of the Court is directed to close this case.

---

Petitioner contends that he cannot be punished for pursuing his appellate remedies. But that is not what is occurring—the government did not change the status quo of Petitioner's detention to retaliate against him for pursuing these remedies. He was detained before he initially asserted his claims for asylum, withholding of removal, and CAT relief. And he continues to remain detained while he challenges the IJ's adverse decisions on those claims.

If the Court accepted Petitioner's argument that continuing to detain a noncitizen who challenges his or her removal after such adverse decisions constitutes punishment, and held that a noncitizen in Petitioner's position was entitled to release or a bond hearing, that would have the opposite effect of punishment: that approach would *reward* detainees who chose to challenge their removal, potentially with release into the United States. The Court is skeptical that the Constitution requires the government to treat detainees who pursue their appellate remedies *better* than detainees who do not. That said, the Court is not unsympathetic to Petitioner's position. He faces a difficult choice: to permit his removal to El Salvador, a country in which he contends he faces the risk of additional detention and torture, or to continue pursuing his challenge to removal and remain in ICE custody within the United States. While neither of these options are enviable, that does not mean that the government is acting unconstitutionally in posing this choice.

[12] Petitioner's authorities are also generally distinguishable from this case. All of Petitioner's in-district cases concern detainees whose underlying cases were held up in administrative proceedings for various reasons—not the situation here, where Petitioner has received merits determinations from both the IJ and the BIA, and is awaiting the Tenth Circuit's decision on a judicial appeal. *See generally Juarez v. Choate*, No. 1:24-CV-00419-CNS, 2024 WL 1012912, at *8 (D. Colo. Mar. 8, 2024); *de Zarate v. Choate*, 23-cv-571-PAB, 2023 WL 2574370 (D. Colo. Mar. 20, 2023); *Daley v. Choate*, 22-cv-03043-RM; 2023 WL 2336052 (D. Colo. Jan. 6, 2023); *Viruel Arias v. Choate*, 22-cv-2238-CNS, 2022 WL 4467245 (D. Colo. Sept. 26, 2022); *Sheikh v. Choate*, 22-cv-1627-RMR, 2022 WL 17075894 (D. Colo. July 27, 2022); *Singh v. Garland*, 21-cv-0715-CMA, 2021 WL 2290712 (D. Colo. June 4, 2021); *Singh v. Choate*, 19-cv-0909-KLM, 2019 WL 3943960 (D. Colo. Aug. 21, 2019). The Court need not and does not pass on how these cases might resolve under the due process test as the Court understand it, or whether it was appropriate to apply a balancing test on the facts specific to those cases.

DATED May 21, 2025.

BY THE COURT:

Gordon P. Gallagher
United States District Judge